**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case No. **18-80124**

18 U.S.C. § 1349
18 U.S.C. § 1347     **CR-ROSENBERG**/Reinhart
18 U.S.C. § 1957
18 U.S.C. § 981(a)(1)
28 U.S.C. § 2461

**UNITED STATES OF AMERICA**

**vs.**

**KENNETH BAILYNSON,**
**MARK AGRESTI,**
**STEPHANIE CURRAN, and**
**MATTHEW NOEL,**

          **Defendants.**
_____/

FILED by ____ D.C.

JUN 2 2 2018

STEVEN M. LARIMORE
CLERK U. S. DIST. CT.
S. D. of FLA. – MIAMI

**INDICTMENT**

The Grand Jury charges that:

**GENERAL ALLEGATIONS**

At all times material to this Indictment:

**Federal Guidelines for Substance Abuse  Treatment**

1.       The U.S. Department of Health and Human Services, Substance Abuse and Mental

Health Services Administration, Center for Substance Abuse Treatment ("SAMHSA") was tasked

with establishing and implementing a comprehensive program to improve the provision of

treatment and related services to individuals with respect to substance abuse and with protecting

the legal rights of individuals who were substance abusers.   42 U.S.C. § 290aa.

2.       "Substance abuse" was defined as "the abuse of alcohol or other drugs." 42 U.S.C.

§ 290cc-34(4).   "Treatment" meant "the management and care of a patient suffering from alcohol

or drug abuse, a condition which is identified as having been caused by that abuse, or both, in order to reduce or eliminate the adverse effects upon the patient."   42 C.F.R. § 2.11.

3.      In addition to substance abuse treatment programs, SAMHSA promulgated guidelines for "sober homes."   Sober homes were living facilities where clients lived together in a drug-free and alcohol-free environment while working to maintain sobriety.   Sober homes generally did not provide medical care or clinical services to their residents; such services were provided at a substance abuse treatment center.   Clients at sober homes were expected to pay their own rent and utilities, allowing the sober homes to recover their costs.   When properly managed, sober homes operated as alcohol and drug free residential environments for individuals attempting to abstain from alcohol and drugs.

4.      Substance abuse treatment centers provided services, such as individual or group therapy sessions, to assist clients in overcoming their addictions.   There were varying levels of treatment provided, including Partial Hospitalization Programs ("PHP"), Intensive Outpatient Programs ("IOP"), and Outpatient Programs ("OP").   PHPs, IOPs, or OPs could be billed to health care benefit programs when they were medically necessary and provided by, or overseen by, licensed medical professionals.

### Substance Abuse Treatment in Florida

5.      Substance abuse services in Florida were governed by the "Hal S. Marchman Alcohol and Other Drug Services Act" ("the Marchman Act"), Fl. Stat. § 397.301.   Under the Marchman Act, private substance abuse service providers' policies regarding payment for services had to comply with federal and state law.   Fl. Stat. § 397.431.

6.      The "Florida Patient Brokering Act" made it a felony offense for any person, health care provider, or health care facility, including any state licensed substance abuse service provider,

to: "(a) Offer or pay any commission, bonus, rebate, kickback, or bribe, directly or indirectly, in cash or in kind, or engage in any split-fee arrangement, in any form whatsoever , to induce the referral of patients referral of patients or patronage to or from a health care provider or health care facility; (b) Solicit or receive any commission, bonus, rebate, kickback, or bribe, directly or indirectly, in cash or in kind, or engage in any split-fee arrangement, in any form whatsoever, in return for referring patients or patronage to or from a health care provider or health care facility; (c) Solicit or receive any commission, bonus, rebate, kickback, or bribe, directly or indirectly, in cash or in kind, or engage in any split-fee arrangement, in any form whatsoever, in return for the acceptance or acknowledgement of treatment from a health care provider or health care facility; or (d) Aid, abet, advise, or otherwise participate in the conduct prohibited under paragraph (a), paragraph (b), or paragraph (c)."   Fla. Stat. § 817.505.

      7.     Florida law also provided that it was "a material omission and insurance fraud . . . for any service provider, other than a hospital, to engage in a general business practice of billing amounts as its usual and customary charge, if such provider has agreed with the insured or intends to waive deductibles or copayments, or does not for any other reason intend to collect the total amount of such charge."   Fla. Stat. § 817.234(7)(a).

### Payment for Residing at Sober Homes

      8.     Unlike substance abuse treatment centers, sober homes generally did not provide medical care or clinical services that could be reimbursed by health insurance.   While there were federal and state guidelines, sober homes were not licensed or funded by state or local governments. Since sober homes were ostensibly places to live, legitimate sober homes generated income through the collection of weekly or monthly rent paid by their residents, just as with any landlord-tenant relationship.

## **Payment for Substance Abuse Treatment**

9.       Insurance coverage for substance abuse treatment and testing was available through a number of avenues, including federal health care benefits programs like the Federal Employees Health Benefits Program ("FEHBP"), health plans sponsored by employers (including the National Railroad Passenger Corporation ["Amtrak"] employee health care benefit plans), and health plans offered directly by private insurance companies.   Health plans sponsored by private employers were governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001, et. seq., while those sponsored by government employer and certain others are exempted from ERISA's jurisdiction.

10.      Both ERISA and non-ERISA health benefit plans, including Affordable Care Act plans, were offered or administered by private insurance companies.

11.      1199 SEIU National Benefit Fund (1199 SEIU); Advantage Health Solutions (Advantage); Aetna Health Management LLC and Aetna Life Insurance for Members (Aetna); Allegant Accountable Care Solutions (Allegant); American Medical & Life Insurance Co. (American); AmeriHealth (AmeriHealth); APWU Health Plan (APWU); Associated Employers Group Benefit (AEGB); Atlantic Health Benefit Plan (Atlantic); Aurora Health Care (Aurora); Blue Cross/Blue Shield (BCBS); Bricklayers Insurance & Welfare Funds Benefit (BI&WFB); Capital Administrators (Capital); Cigna Healthcare (Cigna); Comme HCC Claim (Comme); Construction Workers Trust Fund (Construction); Consumers Choice Health Plan (Consumers); Coresource (Coresource); Corporate & Facilities Adm. by QualCare (QualCare); Coventry Health & Life Ins. Co (Coventry); Cox Health Systems (Cox); CT General Life Ins. (CT); First Carolina Care Ins. Co. (First Carolina); GEHA (GEHA); Gibbs Die Casting Corp. (Gibbs); Golden Rule Insurance (Golden Rule); Hackensack UMC (Hackensack); Harvard Pilgrim Health Care (Harvard); HAS CPA HC

4

Claim (HAS); Health Choice (HC); Health Assurance Pennsylvania (HAP); Healthcare Management Admin. (HMA); HealthPartners Central Minnesota Clinical, Inc. (HPCMC); HealthPartners Group Health Plan (HPGHP); Health Plans Inc. (HPI); HealthScope Benefits (HealthScope); HNE Advisory Services, Inc. (HNE); Holy Name Medical Center (Holy Name); HPHC Insurance Co. (HPHC); Humana (Humana); IBEW Local 640 & Arizona Chapter NECA Joint Trust Funds (IBEW); Insurance Administrator of America, Inc. (IAA); IU Healthplans (IU); Johns Hopkins Healthcare LLC (Johns Hopkins); Kaiser Permanente-Kaiser Foundation Health Plans of GA, Inc. (Kaiser Permanente); Kentucky Laborers District Council H&W Trust Fund (KYLaborers); M&T Bank (M&T); Magnacare (Magnacare); Mason City School CDB Medical (Mason City); Mayo Clinic Health Systems-Eau Claire Hospital, Inc. (Mayo Clinic); Mebco (Mebco); Medical Mutual (MM); Mutual Health Services (MHS); Meritain (Meritain); National Lime & Stone Co (NL&S); Natl Assn of Letter Carrier HPB (NALC); Niagara County Health Plans (NCHP); ODS Companies (ODS); Philadelphia Insurance Co. (PIC); Optum (Optum); PHP Insurance Co. (PHP); Physicians Medical Associates (PMA); Plumbers & Pipefitters Welfare Educations Fund (P&PWEF); PMCS (PMCS); Porter County Government Employee Benefits (PCGEB); PPS Elec Pmt Clearing House Trust (PPS); Preferred Medical Claim Solutions LLC (PMCS); Preferred One Administrative Services (POAS); Regence Group Administrators (RGA); SIHO (SIHO); State of West Virginia (SWV); Suburban Teamsters of Northern Illinois (STNI); Summacare (Summa); Tamko Building Products (Tamko); Teamsters Local 456 Welfare Fund (Local 456); The County of Volusia Deland, FL Health Partnership Plan (County of Volusia); The Empire Plan-NY State Health Ins. Program (Empire Plan); The Ohio State University (OSU); Time Insurance Co., (Time); Township of Parsippany-Troy Hills (Parisippany); Tricare-Humana Military (Tricare); TUFTS Health Plan (TUFTS); United Health Group, Inc./UMR (United); UPMC

Insurance Services (UPMC); Value Options, Inc. (Value); and Welfare Fund Mid-Jersey Trucking Industry, Local 701 (WFMJ) were health insurance providers doing business in the State of Florida who remitted payments for claims by GDSL (as described at paragraph 20 below).

12.     The health insurance providers described above in paragraphs 9 through 11 (collectively referred to hereinafter as "the Insurance Plans") were "health care benefit programs," as defined in Title 18, United States Code, Section 24(b), that is, "public or private plans or contracts, affecting commerce, under which any medical benefit, item or service is provided to any individual."

13.     Under the terms of the insurance policies and consistent with state and federal law, the Insurance Plans were only responsible for claims for services that: (a) were medically necessary and actually rendered, (b) were provided by a properly licensed service provider, and (c) complied with the terms of the health care plans, including the obligation to pay co-insurance and deductibles.

**Bodily Fluid Testing**

14.     Bodily fluid testing could be used to detect recent drug or alcohol use by a client by conducting various tests on a client's urine, blood, and saliva.

15.     Like other medical tests, bodily fluid testing could be billed and reimbursed pursuant to the terms of the insurance policy.  The Insurance Plans were only responsible for claims for testing that was "medically necessary," actually performed, prescribed, and conducted by a properly licensed service provider, and conducted and billed in compliance with the terms of the health care plan, including the obligation to pay co-insurance.

16.     Urine Analysis or Urinalysis ("UA") testing ranged in complexity from screening tests—also known as point of care ("POC") testing—which provided instant results and was relatively simple and inexpensive, to confirmatory testing, which was sent to a laboratory for more

complex analysis and was substantially more expensive.   Laboratories could also conduct complex analysis on blood and saliva samples.

17.     Point of Care ("POC") urine testing involved collecting a client's urine in a specific cup designed for testing. The specimen was analyzed using a color banded or numbered dipstick, allowing for visual positive or negative results.   POC urine testing usually tested for the presence of nine to thirteen specific types of drugs.   POC tests typically cost between $5 and $10 and could be read easily by a layperson. This testing was convenient, less costly, and the results could be read quickly.  POC testing was the most common form of testing performed at sober homes and treatment facilities.

18.     Confirmatory testing, conducted in a laboratory setting, made use of gas liquid chromatography, mass spectrometry, and/or gas chromatography, or high performance liquid chromatography, to analyze the client's urine specimen. These techniques were highly sensitive, and accurately and definitively identified specific substances and the quantitative concentrations of the drugs or their metabolites. Confirmatory testing was more precise, more sensitive, and detected more substances than other types of urine testing.  Results of confirmatory testing took longer and were significantly more expensive.

19.     To bill insurance companies for UAs, providers must submit claims on Form CMS-1500, also known as the Health Insurance Claim Form (HICF), to a patient's respective insurance company.   Before billing for the UAs, providers must first obtain a prescription from the patient's medical doctor, who must deem the UA medically necessary.   HICFs contain, among other information, the patient's name and biographical information, his or her insurance information, diagnosis, date and place of service, the standardized procedure codes, the number of units provided, the total dollar amount being charged, and name and location of the billing company.

The procedure code and the unit volume assist in determining the dollar amount at which the client's insurance company reimburses the provider.   Completed HICFs can be printed and mailed to insurance companies or they can be submitted electronically.   When the HICF is submitted, the provider certifies that the contents of the HICF are true, correct, and complete.

### The Sober Home

20.     GDSL, Inc., a/k/a GOOD DECISIONS SOBER LIVING, Inc. ("GDSL"), was a sober home and laboratory specializing in Urine Analysis (UA) testing located in Palm Beach County, Florida.   GDSL operated in multiple locations under the same corporate name.   Its primary location, referred to by employees as "GDSL Main", was located at Green Terrace Condominiums, 2800 Georgia Avenue, West Palm Beach, Florida, 33405.   GDSL Main was a multi-unit condominium complex that housed GDSL clients as a sober home, as well as private residents who were not associated with GDSL.   The GDSL Laboratory (GDSL Lab), which operated under the same corporate name, was located at 14000 South Military Trail, #211B, Delray Beach, Florida, 33484.   According to corporate records filed with the State of Florida, GDSL was incorporated on March 29, 2012, with **KENNETH BAILYNSON** as the President and Registered Agent.

21.     GDSL submitted claims for reimbursement to more than eighty health care benefit programs, including the FEHBP plans, Amtrak's established plans, private ERISA and non-ERISA health benefit plans, and to the health care benefit programs listed above in paragraph 11 ( "the Insurance Plans").

22.     From approximately September 2011 through December 2015, GDSL submitted claims for substance abuse treatment services in excess of approximately $106,576,358 to the Insurance Plans, and received insurance payments of approximately $31,356,527.

8

### The Defendants and Co-Conspirators

23.     **KENNETH BAILYNSON,** a resident of Palm Beach County, Florida, was the founder and owner of GDSL.  According to corporate records filed with the State of Florida, on March 29, 2012, **BAILYNSON** filed the Articles of Incorporation for GDSL.  **BAILYNSON** was the President and Registered Agent of GDSL.  **BAILYNSON** managed all aspects of GDSL, including hiring and firing personnel, admitting and discharging patients, and making financial decisions.  **BAILYNSON** was the signatory on all GDSL corporate bank accounts.

24.     **MARK AGRESTI**, a licensed medical doctor in the State of Florida, was the Medical Director of GDSL.  As Medical Director, **AGRESTI** was responsible for evaluating patients, developing appropriate plans of treatment, prescribing medically necessary treatment and bodily fluid testing, including UAs, and reviewing UA and other test results.

25.     **STEPHANIE CURRAN,** a resident of Palm Beach County, Florida, was an employee of GDSL.

26.     **MATTHEW NOEL**, a resident of Palm Beach County, Florida, was an employee of GDSL.

27.     Unindicted co-conspirator #1, a resident of Palm Beach County, Florida, was the Registered Agent of a sober home in Palm Beach County, Florida.

28.     Unindicted co-conspirator #2, a resident of Palm Beach County, Florida, was the Registered Agent of a sober home in Palm Beach County, Florida.

29.     Unindicted co-conspirator #3, a resident of Palm Beach County, Florida, was the Registered Agent of a sober home in Palm Beach County, Florida.

30.     Unindicted co-conspirator #4, a resident of Palm Beach County, Florida, was the Registered Agent of a substance abuse treatment center in Palm Beach County, Florida.

## COUNT 1
### Conspiracy to Commit Health Care Fraud and Wire Fraud
### (18 U.S.C. § 1349)

1.      The General Allegations section of this Indictment is re-alleged and incorporated by reference as though fully set forth herein.

2.      From in or around September of 2011, through in or around December of 2015, in Palm Beach County, in the Southern District of Florida, and elsewhere, the defendants,

**KENNETH BAILYNSON,**
**MARK AGRESTI,**
**STEPHANIE CURRAN, and**
**MATTHEW NOEL,**

did willfully, that is, with the intent to further the objects of the conspiracy, and knowingly combine, conspire, confederate and agree with each other, and others, known and unknown to the Grand Jury, to commit offenses against the United States, that is:

a.      to knowingly and willfully execute and attempt to execute a scheme and artifice to defraud a health care benefit program affecting commerce, as defined in Title 18, United States Code, Section 24(b), that is, the Insurance Plans, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, said health care benefit program, in connection with the delivery of and payment for health care benefits, items, and services, in violation of Title 18, United States Code, Section 1347; and

b.      to knowingly and with the intent to defraud, devise and intend to devise a scheme and artifice to defraud and for obtaining money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing the pretenses, representations, and promises were false and fraudulent when made, and for the purpose of executing the scheme and artifice, did knowingly transmit and cause to be transmitted by means of wire communication in

10

interstate and foreign commerce, certain writings, signs, signals, pictures and sounds, in violation of Title 18, United States Code, Section 1343.

## Purpose of the Conspiracy

3.      It was a purpose of the conspiracy for the defendants and their co-conspirators to unjustly enrich themselves by, among other things: (a) obtaining patients covered by the Insurance Plans through the payment of kickbacks and bribes; (b) submitting and causing the submission of false and fraudulent claims to the Insurance Plans; (c) concealing the submission of false and fraudulent claims to the Insurance Plans, and the receipt and transfer of fraud proceeds; and (d) diverting the fraud proceeds for their personal use and benefit, the use and benefit of others, and to further the fraud.

## Manner and Means of the Conspiracy

The manner and means by which the defendants and their co-conspirators sought to accomplish the objects and purpose of the conspiracy included:

4.      **KENNETH BAILYNSON** and co-conspirators established GDSL, a sober home, which was purportedly in the business of providing a safe and drug-free residence for individuals suffering from drug and alcohol addiction.

5.      **KENNETH BAILYNSON** bought multiple units in the condominium complex at 2800 Georgia Avenue, West Palm Beach, Florida, in his own name and in the name of co-conspirators, including **STEPHANIE CURRAN** and **MATTHEW NOEL**, and these units became GDSL Main, the sober home.

6.      To obtain residents for GDSL, **KENNETH BAILYNSON, STEPHANIE CURRAN, MATTHEW NOEL**, and their co-conspirators provided kickbacks and bribes in the form of free or reduced rent when patients agreed to attend drug treatment at other facilities, often in

11

the form of PHP and/or IOP sessions, including at the substance abuse treatment center owned and operated by unindicted co-conspirator #4.   **BAILYNSON, CURRAN, NOEL**, and their co-conspirators also provided other benefits to individuals with insurance who agreed to reside at GDSL and to submit to regular drug testing (typically UAs were administered three or more times per week) at GDSL, so members of the conspiracy could bill the UA to the residents' Insurance Plans.

7.      **KENNETH BAILYNSON, STEPHANIE CURRAN, MATTHEW NOEL**, and their co-conspirators further paid patient recruiters kickbacks and bribes to provide patients to GDSL.

8.      **KENNETH BAILYSON, STEPHANIE CURRAN, MATTHEW NOEL,** and their co-conspirators paid other sober homes in Palm Beach County kickbacks and bribes to provide the urine for the patients at these sober homes to be tested by GDSL Lab, and other external laboratories.   GDSL obtained patients' urine in this manner from sober homes owned or operated by, among others, unindicted co-conspirators 1, 2, and 3.

9.      GDSL would disguise the kickbacks and bribes to the sober homes with bogus contracts in which GDSL would purportedly own the sober homes, and the actual sober home owners and employees were made to appear as employees of GDSL, including but not limited to contracts with un-indicted co-conspirators 1 and 2.

10.      **KENNETH BAILYNSON** and other co-conspirators hired doctors to serve as medical directors of GDSL, including **MARK AGRESTI**.   **BAILYNSON** paid **AGRESTI** a monthly salary, and in return **AGRESTI** ordered drug testing for GDSL's patients, regardless of whether such testing was medically necessary or conducted.

11.      **KENNETH BAILYNSON, STEPHANIE CURRAN, MARK AGRESTI, MATTHEW NOEL,** and their co-conspirators ordered excessive, medically unnecessary

confirmatory testing for GDSL patients on a systematic basis from external laboratories and from GDSL Lab, while failing to use the results of these tests to determine treatment of GDSL patients.

12.     **KENNETH BAILYNSON, MARK AGRESTI, STEPHANIE CURRAN, MATTHEW NOEL,** and other co-conspirators, ordered and caused the ordering of expensive urine drug screens and confirmation tests which were not medically necessary or reimbursable by the Insurance Plans, in that, among other things:   (i) the tests were not medically necessary; (ii) the tests were not timely reviewed by a qualified medical professional or by a doctor or treatment professional in developing or modifying the patients' treatment; (iii) the tests were not ordered and/or authorized until after the tests were performed; and (iv) the tests were not determined to be medically necessary on an individualized basis by a doctor prior to being performed.

13.     **KENNETH BAILYNSON, MARK AGRESTI,** and other co-conspirators created or caused to be created fraudulent documents, including, but not limited to, backdated requisition orders and false medical justification letters for medically unnecessary tests, which were then submitted by GDSL to the Insurance Plans to conceal and perpetuate the fraud.

14.     In order to entice patients to enroll in and remain at GDSL so that conspirators could collect reimbursement from the Insurance Plans for fraudulent UA testing, GDSL did not collect mandatory co-pays, deductibles, and other co-insurance from patients.   Conspirators did not inform the Insurance Plans that they were not collecting the co-insurance payments as required by the terms of the Insurance Plans, and by law in the State of Florida.

15.     **KENNETH BAILYNSON, STEPHANIE CURRAN, MARK AGRESTI MATTHEW NOEL,** and co-conspirators submitted and caused the submission to the Insurance Plans of fraudulent insurance claims, via interstate and foreign wires, that falsely and fraudulently represented that various health care benefits, primarily bodily fluid testing, qualified for

reimbursement and were medically necessary and actually provided, when, in fact, claimed benefits were not provided, and were not medically necessary.  These fraudulent claims failed to disclose that patients had not been required to pay their co-payments and deductibles, and failed to disclose that GDSL patients had been obtained through kickbacks, bribes, and other remuneration paid to patients and patient recruiters, in violation of the laws of the State of Florida.

16.     GDSL submitted approximately $106,576,358 in false and fraudulent claims to the Insurance Plans.   As a result of such false and fraudulent claims, GDSL received insurance payments of approximately $31,356,527 from the Insurance Plans.

17.     **KENNETH BAILYNSON, STEPHANIE CURRAN, MARK AGRESTI, MATTHEW NOEL**, and co-conspirators used the proceeds from the false and fraudulent claims for their own use and the use of others, and to further the fraud.

All in violation of Title 18, United Stated Code, Section 1349.

### COUNTS 2-12
### Health Care Fraud
### (18 U.S.C. § 1347)

1.     The General Allegations section of this Indictment is re-alleged and incorporated by reference as though fully set forth herein.

2.     From in or around September of 2011, through in or around December of 2015, in Palm Beach County, in the Southern District of Florida, and elsewhere, the defendants,

**KENNETH BAILYNSON,**
**MARK AGRESTI,**
**STEPHANIE CURRAN, and**
**MATTHEW NOEL,**

in connection with the delivery of and payment for health care benefits, items, and services, did knowingly and willfully execute, and attempt to execute, a scheme and artifice to defraud a health care benefit program affecting commerce, as defined in Title 18, United States Code, Section 24(b),

14

that is, the Insurance Plans, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, these health care benefit programs.

### Purpose of the Scheme and Artifice

3.      It was a purpose of the scheme and artifice for the defendants and their accomplices to unlawfully enrich themselves by, among other things: (a) obtaining patients covered by the Insurance Plans through the payment of kickbacks and bribes; (b) submitting and causing the submission of false and fraudulent claims to the Insurance Plans; (c) concealing the submission of false and fraudulent claims to the Insurance Plans, and the receipt and transfer of fraud proceeds; and (d) diverting fraud proceeds for their personal use and benefit, the use and benefit of others, and to further the fraud.

### The Scheme and Artifice

4.      The allegations contained in the Manner and Means of the Conspiracy section of Count 1 are re-alleged and incorporated by reference as though fully set forth herein as a description of the scheme and artifice.

### Acts in Execution or Attempted Execution of the Scheme and Artifice

5.      On or about the dates set forth below, in Palm Beach County, in the Southern District of Florida, and elsewhere, the defendants, in connection with the delivery of and payment for health care benefits, items, and services, did knowingly and willfully execute, and attempt to execute, the above-described scheme and artifice to defraud a health care benefit program affecting commerce, as defined by Title 18, United States Code, Section 24(b), that is, the Insurance Plans, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, said health care benefit programs, in that

the defendants submitted and caused the submission of false and fraudulent claims seeking the identified dollar amounts, representing that the services listed below were medically necessary and provided to patients covered by the Insurance Plans:

| Count | Approx. Claim Date | Patient | Approx. Claim Amount | Benefit Provider/ Claim No. | Description of Claim |
|---|---|---|---|---|---|
| 2 | 12/18/13 | K.D. | $6,490 | UHC Claim No. 439438071701 | UA Testing |
| 3 | 01/22/14 | B.S. | $6,342 | BC/BS Claim No. H100000394577552 | UA Testing |
| 4 | 01/27/14 | S.G. | $6,342 | BC/BS Claim No. H100000394577543 | UA Testing |
| 5 | 01/31/14 | T.H. | $9,972 | BC/BS Claim No. H100000394586256 | UA Testing |
| 6 | 02/01/14 | H.K. | $9,972 | BC/BS Claim No. H100000394586683 | UA Testing |
| 7 | 03/31/14 | D.P. | $6,293 | BC/BS Claim No. H100000402627307 | UA Testing |
| 8 | 04/02/14 | R.N. | $6,293 | CIGNA Claim No. 9681409916216 | UA Testing |
| 9 | 04/07/14 | K.D. | $6,562 | CIGNA Claim No. 9651410593017 | UA Testing |
| 10 | 04/09/14 | L.B. | $6,293 | BC/BS Claim No. M00001R594385390 | UA Testing |
| 11 | 05/22/14 | R.M. | $6,298 | BC/BC Claim No. H100000411580306 | UA Testing |
| 12 | 06/30/14 | S.W. | $6,635 | BC/BS Claim No. Q100000417513053 | UA Testing |

In violation of Title 18, United States Code, Sections 1347 and 2.

## COUNTS 13-14
### Money Laundering
### (18 U.S.C. § 1957)

On or about the date specified as to each count below, in Palm Beach County, in the Southern District of Florida, and elsewhere, the defendant,

### KENNETH BAILYNSON,

did knowingly engage and attempt to engage in a monetary transaction affecting interstate and foreign commerce, by, through, and to a financial institution, in criminally derived property of a value greater than $10,000, such property having been derived from specified unlawful activity, as more specifically described below:

| Count | Approximate Date | Description of Monetary Transaction |
|-------|------------------|-------------------------------------|
| 13 | 02/07/2014 | **KENNETH BAILYNSON** negotiated Check No. 10189 for $158,000 from GDSL bank account ending in 5906 at JP Morgan Chase Bank, made payable to Braman Motor Cars |
| 14 | 05/08/2014 | **KENNETH BAILYNSON** negotiated Check No. 6146 for $175,000 drawn on **KENNETH BAILYNSON**'s personal account ending in 7078 at JP Morgan Chase Bank, made payable to God is Awesome, LLC |

It is further alleged that the specified unlawful activity is health care fraud and conspiracy to commit health care fraud, in violation of Title 18, United States Code, Sections 1347 and 1349.

In violation of Title 18, United States Code, Sections 1957 and 2.

## FORFEITURE
### (18 U.S.C. § 982(a)(1) and (a)(7))

1.      The allegations of Counts 1 through 12 of this Indictment are re-alleged and incorporated by reference for the purpose of alleging forfeiture to the United States, pursuant to the provisions of Title 18, United States Code, Section 982(a)(1) and (a)(7).

2.      Upon conviction of any of Counts 1 through 12, charging offenses in violation of Title 18, United States Code, Sections 1347 and 1349 (Health Care Fraud, and Conspiracy to Commit Health Care Fraud and Wire Fraud), the defendants so convicted shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(7), any property, real or personal, which constitutes or is derived from proceeds traceable to the offense.   The property to be forfeited includes the following:

a.      A request for a money judgment in the amount of $31,356,527, representing the approximate total amount of fraud proceeds defendants obtained, directly or indirectly, from the offenses alleged in Counts 1 through 12 of the Indictment;

b.      A multi-family residence located at 4565 Coconut Road, Lake Worth, Florida;

c.      A multi-family residence located at 4593 Coconut Road, Lake Worth, Florida;

d.      A multi-family residence located at 4863 Coconut Road, Lake Worth, Florida;

e.      A single family residence located at 677 Cresta Circle, West Palm Beach, Florida;

f.      A commercial property located at 4236 Lake Worth Road, Palm Springs, Florida;

g.      Condominium Units A2, A6, B11, B12, C13, C14, C15, C16, D19, D22, D24, D25, D26, D28, E31, E32, E34, F35, F36, F38, F39, G41, G46, H47, H50, H52, I56, I57, J59, J60, J61, J64, K65, K66, K68, K73, L75, L76, M83, M84 at Green Terrace Condominiums, 2800 Georgia Avenue, West Palm Beach FL;

3.      The allegations of Counts 13 and 14 of this Indictment are hereby re-alleged and incorporated by reference for the purpose of alleging forfeitures pursuant to Title 18, United Sates Code, Section 982(a)(1).

4.      Upon conviction of Counts 13 and 14 of the Indictment, charging an offense in

18

violation of Title 18, United States Code, Section 1957, the defendant, **KENNETH BAILYNSON**, shall forfeit to the United States any property, real or personal, involved in such offense, pursuant to Title 18, United States Code, Section 982(a)(1).   The property to be forfeited includes the following:

a.      A request for a money judgment in the amount of $31,356,527, representing the approximate total amount of fraud proceeds defendants obtained, directly or indirectly, from the offenses alleged in Counts 13 and 14 of the Indictment;

b.      A multi-family residence located at 4565 Coconut Road, Lake Worth, Florida;

c.      A multi-family residence located at 4593 Coconut Road, Lake Worth, Florida;

d.      A multi-family residence located at 4863 Coconut Road, Lake Worth, Florida;

e.      A single family residence located at 677 Cresta Circle, West Palm Beach, Florida;

f.      A commercial property located at 4236 Lake Worth Road, Palm Springs, Florida;

g.      Condominium Units A2, A6, B11, B12, C13, C14, C15, C16, D19, D22, D24, D25, D26, D28, E31, E32, E34, F35, F36, F38, F39, G41, G46, H47, H50, H52, I56, I57, J59, J60, J61, J64, K65, K66, K68, K73, L75, L76, M83, M84 at Green Terrace Condominiums, 2800 Georgia Avenue, West Palm Beach FL;

5.      If any property described above, as a result of any act or omission of the defendants:

a.      cannot be located upon the exercise of due diligence;

19

     b.     has been transferred or sold to, or deposited with, a third party;

     c.     has been placed beyond the jurisdiction of the court;

     d.     has been substantially diminished in value; or

     e.     has been commingled with other property which cannot be divided

          without difficulty,

then the United States shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c).

All pursuant to Title 18, United States Code, Section 982 (a)(1) and (a)(7).


_____

A TRUE BILL
FOREPERSON


_____

BENJAMIN G. GREENBERG
UNITED STATES ATTORNEY

_____

JAMES V. HAYES
ASSISTANT UNITED STATES ATTORNEY

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA

v.

KENNETH BAILYNSON et al.,

              **Defendants.**

_____   /

CASE NO. _____

## CERTIFICATE OF TRIAL ATTORNEY*

**Superseding Case Information:**

**Court Division**: (Select One)

|   | | |
|---|---|---|
| ___ Miami | ___ Key West | |
| _X_ FTL | ___ WPB | ___ FTP |

New Defendant(s)     Yes ____     No ____
Number of New Defendants
Total number of counts     ____

I do hereby certify that:

1.    I have carefully considered the allegations of the indictment, the number of defendants, the number of probable witnesses and the legal complexities of the Indictment/Information attached hereto.

2.    I am aware that the information supplied on this statement will be relied upon by the Judges of this Court in setting their calendars and scheduling criminal trials under the mandate of the Speedy Trial Act, Title 28 U.S.C. Section 3161.

3.    Interpreter:   (Yes or No)   No
     List language and/or dialect   ENGLISH

4.    This case will take   20   days for the parties to try.

5.    Please check appropriate category and type of offense listed below:

(Check only one)

| | | | (Check only one) | |
|---|---|---|---|---|
| I | 0  to 5 days | ___ | Petty | ___ |
| II | 6  to 10 days | ___ | Minor | |
| III | 11  to 20 days | _X_ | Misdem. | |
| IV | 21 to 60 days | ___ | Felony | _X_ |
| V | 61 days and over | ___ | | |

6.    Has this case been previously filed in this District Court?   (Yes or No)   NO
If yes:
Judge:                        Case No. _____
(Attach copy of dispositive order)
Has a complaint been filed in this matter?     (Yes or No)   NO
If yes:
Magistrate Case No.
Related Miscellaneous numbers: _____
Defendant(s) in federal custody as of _____
Defendant(s) in state custody as of _____
Rule 20 from the District of
Is this a potential death penalty case? (Yes or No)   NO

7.    Does this case originate from a matter pending in the Northern Region of the U.S. Attorney's Office prior to October 14, 2003?   Yes _____   No _X_

                                         _____
                                       JAMES V. HAYES
                                       ASSISTANT UNITED STATES ATTORNEY
                                       Florida Bar No. A5501717

*Penalty Sheet(s) attached                                    REV 5/3/17

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA**

<u>PENALTY SHEET</u>

**Defendant's Name**:   **KENNETH BAILYNSON**

**Case No**:

Count #: 1

  Conspiracy to Commit Health Care Fraud and Wire Fraud

  Title 18, United States Code, Section 1349

**\*Max. Penalty:**        Twenty (20) Years' Imprisonment

Counts #: 2-12

  Health Care Fraud

  Title 18, United States Code, Section 1347

**\*Max. Penalty:**        Ten (10) Years' Imprisonment as to each count

Counts #: 13, 14

  Money Laundering

  Title 18, United States Code, Section 1957

**\*Max. Penalty:**        Ten (10) Years' Imprisonment as to each count

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

## PENALTY SHEET

**Defendant's Name**:   **MARK AGRESTI**

**Case No**:

Count #: 1

  Conspiracy to Commit Health Care Fraud and Wire Fraud

  Title 18, United States Code, Section 1349

**\*Max. Penalty:**        Twenty (20) Years' Imprisonment

Counts #: 2-12

  Health Care Fraud

  Title 18, United States Code, Section 1347

**\*Max. Penalty:**        Ten (10) Years' Imprisonment as to each count

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

PENALTY SHEET

**Defendant's Name**:   **STEPHANIE CURRAN**

**Case No**:

Count #: 1

  Conspiracy to Commit Health Care Fraud and Wire Fraud

  Title 18, United States Code, Section 1349

**\*Max. Penalty:**        Twenty (20) Years' Imprisonment

Counts #: 2-12

  Health Care Fraud

  Title 18, United States Code, Section 1347

**\*Max. Penalty:**        Ten (10) Years' Imprisonment as to each count

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

<u>PENALTY SHEET</u>

**Defendant's Name**:   **MATTHEW NOEL**

**Case No**:

Count #: 1

  Conspiracy to Commit Health Care Fraud and Wire Fraud

  Title 18, United States Code, Section 1349

**\*Max. Penalty:**        Twenty (20) Years' Imprisonment

Counts #: 2-12

  Health Care Fraud

  Title 18, United States Code, Section 1347

**\*Max. Penalty:**        Ten (10) Years' Imprisonment as to each count

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**