# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

## CASE NO. 18-CR-80124-RAR-2

**UNITED STATES OF AMERICA**

v.

**MARK AGRESTI**,

Defendant.

_____/

## ORDER GRANTING MOTION FOR NEW TRIAL

The famed science-fiction writer Robert A. Heinlein once wrote that the "slickest way in the world to lie is to tell the right amount of truth at the right time—and then shut up."[1]  The star witness in this case, Kenneth Bailynson, might have been wise to follow Heinlein's advice—instead, he forgot to shut up.

Throughout his testimony at Defendant Mark Agresti's trial, Bailynson weaved lies with truths, crafting a narrative that pitted his word against Agresti's.  Even more, Bailynson ensured the only person who could pull a thread out of the intricately woven tapestry was dead.  Bailynson's fable was crucial to Defendant's conviction.  The Government said so: "Without him, there would not have been a conviction, I don't think. I suppose the expert was—but really, without Mr. Bailynson, there was *no chance of a conviction*."  [ECF No. 521] at 6–7 (emphasis added).

But while Bailynson's conviction-making testimony undoubtedly contained some truths, the problem lies in his failure to tell the right amount of truth *or* shut up, as Heinlein advised.  As is now clear—largely because Bailynson decided to brag about it to anyone who would listen—Bailynson committed perjury.  Then, Bailynson claimed he lied about the lying to try to make the

---

[1] Robert A. Heinlein, *Stranger in a Strange Land* (1961).

earlier lies stick—specifically, that he lied when he said he committed perjury, rather than be seen as a snitch.

Accordingly, Agresti now moves for a new trial, asserting that newly discovered evidence and the interests of justice require a new trial given Bailynson's perjury. *See generally* [ECF Nos. 585, 627]. The Government, in contrast, opposes a new trial for two reasons: first, that there was no perjury because Bailynson's second set of lies (the "retraction" of the "recantation") should be believed; and second, that Bailynson's testimony was not all that important because the Government could have proven Agresti's guilt without the perjured testimony. *See generally* [ECF No. 596], [ECF No. 626]; *cf.* [ECF No. 521] at 6–7 ("Without him, there would *not have been a conviction . . . .*") (emphasis added).

As the new evidence shows—and because Bailynson's purported motives make little sense—it is clear he committed perjury during Agresti's trial and did not merely retract his recantation. Moreover, Bailynson's testimony was material, not cumulative or impeaching, and indelibly tainted the trial. Accordingly, as explained herein, it is hereby

**ORDERED AND ADJUDGED** that the Motion for New Trial, [ECF No. 585], is **GRANTED**.

## BACKGROUND

On June 22, 2018, a Grand Jury returned an indictment against Defendant Mark Agresti, along with co-defendants Kenneth Bailynson, Stephanie Curran, and Matthew Noel. *See generally* Indictment, [ECF No. 3]. Agresti was charged with conspiracy to commit health care and wire fraud, in violation of 18 U.S.C. § 1349 (Count 1); and eleven substantive counts of health care fraud, in violation of 18 U.S.C. § 1347 (Counts 2–12). *Id.* On February 10, 2022, after an eleven-day trial, [ECF No. 357], the jury convicted Agresti on all twelve counts. [ECF No. 399]. Of those eleven days, star witness Kenneth Bailynson's testimony spanned four days—nearly the

entire first week of trial.  *See generally* [ECF Nos. 375–78].  On May 27, 2022, Agresti was sentenced to 100 months imprisonment, three years of supervised release, and $31,041,938.68 restitution jointly and severally with Bailynson, Curran, and Noel.  [ECF Nos. 559; 564].

Defendant now moves for a new trial under Federal Rule of Criminal Procedure 33(b)(1), based on newly discovered evidence of perjury and related misconduct undermining the testimony of the Government's chief witness at trial, Kenneth Bailynson.  [ECF No. 585] at 1.  As part of the Motion for New Trial, Defendant also requested an evidentiary hearing regarding Bailynson's perjury, *id.* at 10, which the Government did not oppose and the Court granted.  The evidentiary hearing was held on June 3–4, 2024.[2]  [ECF Nos. 624, 625].  After the evidentiary hearing, the Court requested both parties submit summations of the evidence regarding whether a new trial should be granted.  [ECF No. 623]; *see also* [ECF Nos. 626; 627].

Parallel to the Motion for New Trial, Agresti also filed an appeal.  Once a case is on appeal, "the district court may either deny the motion on its merits or certify that the motion should be granted in order to afford the appellate court jurisdiction to entertain a motion to remand."  *United States v. Ellsworth*, 814 F.2d 613, 614 (11th Cir. 1987).  The Court certified its intent to grant the Motion for New Trial, [ECF No. 631], and, upon defense counsel's motion, the Eleventh Circuit remanded in full.  *See United States v. Agresti*, No. 22-11995, (11th Cir. January 30, 2025), ECF No. 28.  Accordingly, this Court has jurisdiction to consider and grant the Motion for New Trial.

---

[2] The Court held the evidentiary hearing pursuant to its jurisdiction to entertain the Motion for New Trial, as well as the Eleventh Circuit's stay of proceedings pending resolution of district court proceedings on the Motion.  *See United States v. Agresti*, No. 22-11995, (11th Cir. May 5, 2023), ECF No. 26.  *See also United States v. Cronic*, 466 U.S. 648, 667 n.42 (1984) ("The District Court had jurisdiction to entertain the motion and either deny the motion on its merits, or certify its intention to grant the motion to the Court of Appeals, which could then entertain a motion to remand the case.").

## I. Bailynson's Testimony at Trial

Clearly, Bailynson's testimony was important—so, what exactly did he testify about? Bailynson's story can be boiled down to this: that he paid Agresti thousands of dollars in cash beyond his salary and that cash proves Agresti was in on the fraud with Bailynson. *See generally* [ECF No. 626] (Government's summation of evidence); [ECF No. 627] (Agresti's summation of evidence). There are only two people in the world who could confirm Bailynson paid Agresti this cash: one of these people, "Black Fred," is dead, and the other is Bailynson himself. Fortuitously, Bailynson was available to testify; less fortuitously, "Black Fred" was not. So, when Bailynson said these cash payments happened, Agresti was put on the defensive—having to rebut a story for which there was no proof beyond Bailynson's testimony. Agresti says he never took any money besides his salary, which stemmed from his role as medical director at the sober living facility where the fraud occurred. The entire trial became a story of he said-he said.

Everyone agreed that the only issue at trial was Agresti's intent as to the underlying fraud, which concerned urinalysis testing done at the sober living home. *See* [ECF No. 626] at 3 (Government explaining that "[t]he only disputed issue at trial was the Defendant's knowledge and intent as to the medically unnecessary UAs"); [ECF No. 407] at 84 (defense counsel explaining, during closing, that "the sole issue in this case is whether Dr. Agresti knowingly and willfully conspired to commit healthcare fraud," or whether he had simply been "negligent at work"). Consequently, Bailynson's testimony as to Agresti's intent, as evidenced by the alleged cash payments, was the key issue at trial.

After both Bailynson and Agresti had been sentenced, Bailynson said he invented the entire story about giving cash payments to Agresti (it turns out he also said this before he testified, but that was not known until later). This is the lie Agresti now describes as perjury. *See generally* [ECF No. 627]. But then, Bailynson said he lied about inventing his testimony—that the story

about the cash payments was, indeed, true.  He said he lied about lying to protect himself; he did not want to be seen as a snitch.  This is the lie that the Government describes as the "retraction" of the "recantation."  *See generally* [ECF No. 626].  There has never been any evidence that Bailynson was in danger because he testified against Agresti.

## II.  The Evidence

Because this case spans six years, nearly two weeks of trial and evidentiary hearings, and a Jenga tower of lies, the parties' summations present the best record of the evidence.

### a.  Agresti's View

The Court begins with Agresti's view on why he deserves a new trial in light of Bailynson's perjury.  [ECF No. 627].  Agresti argues that the evidence established at the evidentiary hearing satisfied the five elements required to succeed on a motion for new trial: that the evidence was newly discovered after trial; there was no lack of due diligence by the defense; the evidence is more than merely cumulative or impeaching; the evidence is material to issues in the case; and that a new trial conducted with the new evidence would probably produce a different result.  *Id.* at 1; *see also United States v. Jernigan*, 341 F.3d 1273, 1287 (11th Cir. 2003), *abrogated on other grounds*, (quoting *United States v. Ramos*, 179 F.3d 1333, 1336 n.1 (11th Cir. 1999)).

Agresti focuses primarily on the elements pertaining to the more-than-cumulative or impeaching nature of the evidence, its materiality, and the probability of a new trial.  [ECF No. 627] at 2.  And as one might expect, Agresti repeatedly relies on the Government's assertion at Bailynson's sentencing that "without Mr. Bailynson, there was no chance of conviction."  *See, e.g.*, *id.* at 3, 23.  Agresti's argument is built on the idea that without Bailynson, there was really no evidence of what he was thinking: any proof of conspiracy, knowledge, willfulness, or intent to defraud.  *Id.*  Without Bailynson's testimony, the evidence might show a conspiracy to commit fraud, but not one in which Agresti was involved.  *Id.* at 3–4.

According to Agresti, the evidence—including Bailynson's testimony at the evidentiary hearing and his statements to at least seven people—shows that Bailynson told many people, both before and after trial, that he planned to and did commit perjury. *Id.* at 4–5. At the evidentiary hearing, Bailynson said: "I did tell people that I made up the cash to Dr. Agresti." [ECF No. 624] at 121. He also admitted that he told his acquaintance (and bag man) Willie Colón "repeatedly, about perjuring [him]self about the cash payments," claiming he preferred to be seen "in the public eye as a liar and a perjurer . . . than [a] rat, snitch, and government informant." *Id*. at 128; *see also id.* at 139 (Bailynson stating that "being called a fraudster is a thousand times worse than being called a child molester"). But Bailynson did not just tell Colón, whom he met after the trial; he also told several others about his plan. *See, e.g.*, *id.* at 109 (Bailynson explaining he told Matt Noel that to ensure his story about cash payments to Agresti made sense, he "had to change [the] story about paying Dr. Agresti at the yacht club because" he feared club records would contradict him, even though he did not "know what records there are"); *id.* at 42 (Noel explaining Bailynson told him that "he never made cash payments. He said he used Fred because Fred was dead, and there was no way to prove that, prove that it was a lie"). Agresti notes ample evidence belying the veracity of Bailynson's purported reasoning for his recantation: that he did not want to be seen as a snitch. Bailynson explained that he "continued to tell Mr. Colón about cooperation in other cases that were not even public yet, that only the government knew about." *Id.* at 151.

Agresti stresses the fact that, despite claiming to fear being seen as a cooperator, Bailynson admitted he "sent articles to pretty much anyone and everyone bragging about [his] cooperation." *Id.* at 114. In addition to establishing the fact of the lies, Agresti also underscores several other factors that make the story questionable, including: changing versions of the story, meetings that never occurred, the lack of any business records to support the only parts of the story that could have been supported by outside evidence, and evidence that Fred was of good character and

unlikely to have participated in Bailynson's cash payments scheme.  [ECF No. 627] at 6, 9.  For example, in Bailynson's original tale, he gave Agresti one of the envelopes of cash at the Palm Beach Yacht Club.  But at some point— according to Agresti, the point at which it became clear business records could bolster or hinder this anecdote—Bailynson changed this part of the story, so that there was no longer a way to verify it.  *Id.* at 9; *see also* [ECF 624] at 41–42 (Noel explaining that Bailynson told him: "I caught myself in a lie. I realized that the Palm Beach Yacht Club keeps track of all their guests, so instead of saying that we had lunch, I had to say that we met, like, outside the Palm Beach Yacht Club").  Agresti likewise notes that Bailynson said his lawyers could corroborate the cash payments, which his lawyers expressly refuted.  *See* [ECF No. 378] at 59–62.

Agresti also directly refutes the Government's assertion that Bailynson retracted his recantation, as opposed to admitting to perjury.  Agresti notes that there is *pre-* and *post-*trial evidence that Bailynson said he was going to and then did commit perjury.  *Id.* at 8; [ECF No. 624] at 124 (Bailynson admitted the perjury plan to Renee Favor while driving to debriefings: "Q. And you told Ms. Favor, prior to trial, in route to a briefing with the government, that you intended on perjuring yourself at trial?  A. Yes, sir."; and conceded that after trial, he admitted to Favor that he "perjured [him]self about cash payments"); *id.* at 116 (Bailynson, when asked whether he told Lilly Fumero "in 2020, prior to testifying against Dr. Agresti, that you were carefully planning your perjury," he replied: "A. Yes, sir.").

Further, Agresti argues this evidence of perjury cannot be merely impeaching since it was the main evidence the Government presented to prove Agresti's intent—an element of the crime. [ECF No. 267] at 12–13.  Nor can perjured testimony be considered cumulative since there was no other evidence regarding the cash payments: no other witnesses testified about the payments and there was no documentation regarding them.  *Id.* at 13.  Agresti cites the indictment to argue that the story about the cash payments was material, since the indictment states that the purpose of

the scheme was to "unlawfully enrich themselves" through "payment of kickbacks and bribes," "concealing . . . receipt and transfer of fraud proceeds," and "diverting fraud proceeds for their personal use and benefit." *Id.* at 15.  Without Bailynson's cash-payment story, there was no evidence that Agresti benefitted from the alleged conspiracy in any of the ways specifically detailed by the indictment.

The final prong of Agresti's summation regards how discovery of this new evidence would likely produce a different outcome.  *Id.* at 18–20.  To support this contention, Agresti presents a long list of evidence that the jury might view differently, including:

- the testimony of witnesses regarding separation between Agresti and the medical staff, and Agresti's discomfort with Bailynson's testing frequency;

- the fact that Agresti made no factual misstatements about patient conditions or patient treatment in any letter to insurance companies;

- that the issue of medical necessity was one handled differently by different insurance companies regarding how much testing was warranted to prevent addiction relapse;

- that Bailynson's denigrating description of the GDSL employee's competence in reviewing laboratory testing results might have been crafted just to prejudice Agresti;

- that the test review function of the urinalysis was geared to maintaining residential qualification, not some other ongoing treatment by the doctor (and that Agresti's explanation of this fact to insurance companies caused some to stop paying);

- that medical necessity is not defined by "what is cost-effective," as the Government argued in closing, [ECF No. 407] at 132; and

- that the step-down protocol authored by Agresti might well have been authentic (contrary to what Bailynson claimed), where the Government's own charts of residents who were frequently tested were heavily skewed to the first three or four months of their residency in the sober home and where other residents said testing worked, thereby reducing the loss of life.

[ECF No. 627] at 18–20. Agresti similarly emphasizes on the many ways in which the Government focused on Bailynson's testimony at trial and how it adopted and reiterated the narrative Bailynson created about the cash payments. *See id.* at 21, 24 (detailing the ways the Government relied on Bailynson's story at trial). Moreover, Agresti argues the outcome would be different because Agresti would not have had to testify to rebut Bailynson's lies. *Id.* at 23 ("Much like dominoes falling, Bailynson's lies forced Agresti to testify, which forced the government to impeach Agresti, which enabled the government in closing argument to repeatedly say Agresti, not Bailynson, was the liar.").

### b.  The Government's View

Next, the Court summarizes the Government's argument and evidentiary support opposing a new trial. *See generally* [ECF No. 596] (responding to the motion for new trial); [ECF No. 626] (summarizing opposition evidence after the Court's evidentiary hearing). The Government, in its summation, primarily argues that Bailynson's post-trial statements are "merely impeaching because the Defendant would have been convicted even had the jury heard them at trial and discounted Bailynson's testimony." [ECF No. 626] at 8. The Government does not emphasize or re-argue its earlier assertion that Bailynson retracted his recantation, *see* [ECF No. 596], noting that the Court indicated during the evidentiary hearing that it did not think Bailynson's retraction was credible, *see* [ECF No. 626] at 1.

The Government begins by stressing several pieces of evidence that the Court can only assume are intended to bolster its opposition to a new trial, though it is unclear how the statements presented do so.  The Government first cites Colón's testimony at the evidentiary hearing, noting that Colón said Bailynson told him: "that the only way for him to get time off his sentence was to lie and make it up, that he gave cash to the doctor."  *Id.* at 4; *see also* [ECF No. 625] at 11.  The Government then notes that Colón said that "the only thing [Bailynson] lied about was giving the doctor cash; that was it.  That was the only lie."  [ECF No. 626] at 1; *see also* [ECF No. 625] at 12.  But Colón's comment about a single lie was in response to defense counsel asking if Bailynson had *recanted* any statements about committing perjury—it does not serve to limit the scope of Bailynson's lies.  [ECF No. 625] at 12.  Next, the Government discusses several instances in which Bailynson told someone else that he felt he "needed the story about paying Agresti $9,000 in cash 'to get [the Government's] attention and bury him,'" that "he had to cooperate because the FBI threated [sic] him with more prison time and other indictments against his girlfriend and others if he didn't cooperate," and that "he thought that if Agresti did not get convicted, Bailynson would not get as much time off his sentence."  [ECF No. 626] at 4–5.  The Government explains that these statements by Bailynson show that defense counsel could have asked him about why he did not think he committed a crime during the trial.  *Id.* at 5–6.  The Government, however, fails to elucidate how knowing Bailynson thought he did not commit a crime affects his post-trial admissions of perjury.

Relying on *United States v. Valdes*, the Government argues that "Bailynson's post-trial statements are merely impeachment because the Defendant would have been convicted even had the jury heard them at trial and discounted Bailynson's testimony."  *Id.* at 8; *see also United States v. Valdes*, No. 07-CR-20288, 2010 WL 11629648, at *9 (S.D. Fla. Nov. 22, 2010).  The Government essentially makes a single argument: that there was sufficient evidence to convict

Agresti without Bailynson's testimony.  [ECF No. 626] at 8–9.  The Government mentions only in passing, in a footnote, its own comments about the essential nature of Bailynson's testimony, and makes no real attempt to rebut its own statements, asserting instead that it has always thought the testimony of its medical expert, Dr. Margaret Jarvis, was crucial.  *Id.* at 11 n.6.  It then proclaims that "the issue is not whether Bailynson's testimony was the main reason the Defendant was convicted at the first trial; the issue is whether Agresti would be convicted at a second trial if the newly discovered evidence was used at this trial." *Id.*; *cf.* [ECF No. 521] at 6–7 ("*I suppose the expert was—but really, without Mr. Bailynson*, there was no chance of a conviction." (emphasis added)).

To maintain the assertion that there was plenty of evidence without Bailynson's testimony, the Government contends that the testimony of its additional witnesses, coupled with related documents, "conclusively proved the Defendant's intent to commit healthcare fraud."  [ECF No. 626] at 2.  The Government specifically points to testimony from: its medical expert, Dr. Jarvis; a former resident and employee of the sober living home, Felicia Calame Ortiz; two cooperating Government witnesses, Eric Snyder and Paul Materia, who worked at a different addiction treatment facility where Agresti was medical director; and IRS Agent Pamela Martin.

Dr. Jarvis's testimony contains three main themes.  First, there was a lot of urinalysis testing—more than she had seen before, and she thought it was too much.  That there was no explicit standard of care at that time by which to compare Dr. Agresti's action was irrelevant—he "violated basic common-sense." *Id.* at 9, 11; *see also* [ECF No. 384] at 60–61.  Second, she believed no test could be medically necessary without review by the ordering physician or used in treatment, and she did not think these tests were being reviewed or used meaningfully as part of patient treatment because residents were not evicted when they tested positive for illegal drugs.  [ECF No. 626] at 10.  Third, Dr. Jarvis explained that, given Dr. Agresti's explanation that the

frequent testing was meant to serve as a deterrent, she thought a cheaper test could have been used. [ECF No. 383] at 66, 143.  She believed the testing was so medically unnecessary that it could only have been done to make money.  [ECF No. 626] at 11; *see also* [ECF No. 384] at 58–59 (Dr. Jarvis: "I don't see any medical rationale for those tests.  So I would conclude that there's some other reason, perhaps financial gain, but there must be some other reason for doing it.").  The Government maintains that this testimony alone is sufficient to prove Dr. Agresti's intent.  [ECF No. 626] at 11 ("Based on Dr. Jarvis'[s] testimony alone . . . the Defendant could have been convicted.").

Next, the Government details the testimony of Felicia Calame Ortiz, a former resident and later, a "clinical care coordinator" at the sober home.  *Id.* at 10–14.  Calame Ortiz testified about testing frequency, protocol, and billing, including the insurance companies' requirements related to proof of medical necessity and her own feelings of being overwhelmed by her workload.  *Id.* According to the Government, "Ortiz's testimony established the majority of what Bailynson testified about"—namely Agresti's authorization of 3–4 urinalysis tests per week, the frequency with which Agresti reviewed the tests, and Agresti's lack of complaint when Bailynson did not implement Agresti's step-down testing plan —"*except* for the cash payments to Agresti."  *Id.* at 14 (emphasis added).

The Government also highlights that a lab supervisor, Lindsay Sangillo, testified that Dr. Agresti—whom she saw only once and never spoke to—authorized the urinalysis tests and that the lab was frequently delayed in processing the tests results.  *Id.* at 15.  Sangillo also testified that she once went to Bailynson, the person with whom she typically worked, to share her concerns that the tests were not being reviewed and that she resigned after four months because she felt "there were things that appeared to be unethical happening," including Bailynson's failure to hire

a laboratory director after the previous person left the position. *Id.* at 15; *see also* [ECF No. 379] at 178–79.

The Government also presents testimony from an IRS agent, Pamela Martin, who interviewed Agresti "years before." [ECF No. 626] at 16. Martin's testimony included Agresti's own opinions about his job at the sober living home, including information about his salary and raises he got as the number of patients increased. *Id.* at 16. Martin also shared that Agresti told her "that people at GDSL had changed his orders" related to confirmatory testing, [ECF No. 402] at 1482, and that "he recalled one occasion that Ken Bailynson did bring him $3,000 in cash, and he told him he didn't want to be paid in cash. He wanted only to be paid by check." *Id.* at 1480.

Two more Government witnesses, Paul Materia and Eric Snyder, worked with Agresti at a different sober living home where he served as medical director. Both Materia and Snyder testified about the frequency of urine testing done at the other sober living home, as well as the fact that Agresti had not reviewed all the tests because he said he did not have time to do so. [ECF No. 626] at 17–18. The last witness relied on by the Government, Melissa Parks, was a healthcare accountant that analyzed billing at the sober living home. *Id.* at 18–19. According to the Government, "Parks corroborated Dr. Jarvis, Ortiz, and Sangillo, all of whom stated that Agresti had not reviewed the UAs, and that confirmatory UA testing at GDSL as authorized by the Defendant followed a clear pattern of 3-4x per week." *Id.* at 19.

Lastly, the Government contends a jury could have credited the non-perjured parts of Bailynson's testimony because "the jury could have believed the portions of Bailynson's testimony that were corroborated by other witnesses." *Id.* at 19 n.10. The Government also asserts that it could still convict Agresti with Bailynson as a witness, since he "was effectively cross-examined about his credibility throughout the first trial," because he described himself on the stand as a "very good" liar and as "greedy," and because "[w]hile the exposure of his post-trial text messages would

certainly provide more fodder for cross-examination, they would in the end be additional evidence to show Bailynson was a liar." *Id.* at 19 n.10, 25; *see also* [ECF No. 378] at 66, 79.

Overall, the Government maintains that it "has shown that it could have easily convicted Agresti based on the testimony of Dr. Jarvis, Ortiz, Snyder and Materia, Pam Martin, Melissa Parks, and the other documents and evidence in this case." *Id.* at 25.

## **LEGAL STANDARD**

Upon a defendant's motion, "the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). A motion for new trial based on newly discovered evidence must be filed within three years of the guilty verdict. *Id.* 33(b)(1). Agresti's Motion is timely.

A defendant must prove five elements to prevail on a motion for new trial:

> To succeed on a motion for new trial based on newly discovered evidence, the movant must establish that (1) the evidence was discovered after trial, (2) the failure of the defendant to discover the evidence was not due to a lack of due diligence, (3) the evidence is not merely cumulative or impeaching, (4) the evidence is material to issues before the court, and (5) the evidence is such that a new trial would probably produce a different result.

*United States v. Jernigan*, 341 F.3d 1273, 1287 (11th Cir. 2003), *abrogated on other grounds*, (quoting *United States v. Ramos*, 179 F.3d 1333, 1336 n.1 (11th Cir. 1999)).[3]  Failure to satisfy any of these elements defeats a motion for new trial.  *United States v. Starrett*, 55 F.3d 1525, 1554 (11th Cir. 1995).

Notably, "[m]otions for a new trial based on newly discovered evidence are highly disfavored in the Eleventh Circuit and should be granted only with great caution. Indeed, the

---

[3]  A deep dive into Eleventh Circuit case law shows that two versions of the test for analyzing a motion for new trial have been used: one with four elements, and one with five. *Compare United States v. Williams*, 816 F.2d 1527, 1530 (11th Cir. 1987) *with United States v. Haimowitz*, 725 F.2d 1561, 1574 (11th Cir. 1984). However, both versions derive from *Ledet v. United States*, 297 F.2d 737, 739 (5th Cir. 1962), and appear to be the result of linguistic imprecision.

defendant bears the burden of justifying a new trial." *United States v. Campa*, 459 F.3d 1121, 1151 (11th Cir. 2006) (*en banc*) (citation omitted). But a "motion for new trial is appropriate if the newly discovered evidence 'afford[ed] reasonable grounds to question the fairness of the trial or the integrity of the verdict.'" *Id.* at 1151 n.268 (citing *United States v. Williams*, 613 F.2d 573, 575 (5th Cir. 1980)).

## ANALYSIS

Agresti has sufficiently established the elements necessary to grant a new trial. Two of the elements are not at issue—no one disputes that the evidence of Bailynson's perjury was discovered after trial, nor is there any assertion that a lack of due diligence on counsel's part caused the failure to discover the evidence earlier. That leaves three open questions: (1) Was the evidence of Bailynson's perjury merely impeaching or cumulative; (2) Was the evidence of Bailynson's perjury material; and (3) Is the evidence of Bailynson's perjury such that a new trial would probably produce a different outcome? *See Jernigan*, 341 F.3d at 1287. Because the answer is yes to all three questions, "[t]his conviction is tainted, and there can be no other just result than to accord [Agresti] a new trial." *Mesarosh v. United States*, 352 U.S. 1, 9 (1956); *see also id.* at 14 ("The government of [a] strong and free nation does not need convictions based upon such testimony. It cannot afford to abide with them.").

### I. Bailynson Did Not Retract a Recantation, He Committed Perjury

The first issue is whether Bailynson committed perjury or merely retracted his recantation. The Court has no doubt that Bailynson committed perjury. As to this point, the Court reiterates its reasoning as explained during the evidentiary hearing:

> I don't know that I believe he lied about lying. I think that he did, quite frankly, lie on the stand about this episode with Mr. Agresti. I just—I can't really square up his purported motives for why he would have made up that story for multiple people other than he actually did it. He wanted to brag about it. He was proud about it.

[ECF No. 625] at 23.  Black's Law Dictionary defines "recant" as "[t]o withdraw or renounce (prior statements or testimony) formally or publicly."  *Recant*, *Black's Law Dictionary* (12th ed. 2024).  And it defines "perjure" as "[t]o make (oneself) culpable of deliberately making material false or misleading statements while under oath."  *Perjure*, *Black's Law Dictionary* (12th ed. 2024).  Before reaching the evidentiary conclusions based on Bailynson's testimony and manner at the evidentiary hearing, it is worth noting the inherent temporal restrictions within the first definition.  Recantation requires one to withdraw, or in some form *take back* what has already happened—in other words, recantation requires a backward-looking action.  But at the evidentiary hearing, Bailynson admitted to discussing his plan to commit perjury *before* he ever testified at trial.  Definitionally, a *re*cantation cannot occur before the testimony occurs.  Conversely, Black's Law Dictionary lists no comparative temporal restrictions on the act of perjuring; it requires only the contextual restriction of being under oath, which Bailynson was when he lied at trial.

Beyond the definitional limitations, Bailynson's story just does not make sense—it is incredible in that Bailynson *is not* a credible witness.  He claims that he lied about lying so that he would not be seen as a snitch.  But he told these lies before, during, and after trial.  Bailynson told them when he was in court, when he was on the way to court, when he was in prison, and when he was not in prison.  Bailynson's lies lack any limits that would otherwise explain his asserted motive.  During the evidentiary hearing, defense counsel said to Bailynson, "You actually copied the articles about you being a snitch in text messages, bragging," and Bailynson replied: "Sir, they were going to find out about them anyway."  [ECF No. 624] at 115.  This does not seem like the answer of someone who is afraid of the consequences of being seen as a government cooperator and it directly contradicts any purported motive stemming from fear of being seen as a snitch while in prison.  Moments later, Bailynson admitted that—prior to Agresti's trial—he had told at least one woman he met on a dating site about the planned perjury in order to "get laid."  *Id.* at 116–17.

Based on everything Bailynson has said, this would seem to be the truest of his statements—he was in it for himself.  He needed to pin the blame on someone else and crafted a narrative that could not be corroborated by any living person.  He was proud of what he did because he actually did it.  Bailynson's error, then, was to boast to anyone who would listen.

Moreover, the Government's attempt to create separation between a motion for new trial when based on a retracted recantation as compared to perjury is misleading—at best.  The Government discounts the impact of the perjury by explaining that "[i]n particular, motions for a new trial based on witness recantation are viewed with extreme caution."  Unfortunately for the Government, the case it cites as support for this proposition, *Newman v. United States*, 238 F.2d 861, 862 (5th Cir. 1956), continues to say that "[r]ecantation is 'looked upon with the utmost suspicion'" and that "a new trial should be granted when, (a) The court is reasonably well satisfied that the testimony given by a material witness is false.  (b) That without it the jury might have reached a different conclusion."  *Id.* at 862 n.1.

The Government then cites *United States v. Santiago* for the proposition that "when a witness recants and later retracts his recantation, no new trial is warranted because the witness's 'version of events remains exactly as it was at trial.'"  837 F.2d 1545, 1550 (11th Cir. 1988).  But that is not what *Santiago* says.  There, the court called it "strained" to argue that the recantation in that case was newly discovered evidence because the witness had "since retracted his recantation"—meaning that the witness's "version of events remain[ed] exactly as it was at trial." *Id.*  The *Santiago* court was analyzing whether a recantation constituted newly discovered evidence; it was not laying out a different standard for recantation versus perjury.  Whether the perjury here was newly discovered is not at issue; as such, *Santiago*'s reasoning does not apply.  Indeed, the necessary elements for granting a motion for new trial do not differ based on whether there was perjury or a retracted recantation.  *See Jernigan*, 341 F.3d at 1287.

## II.  Agresti Deserves a New Trial

As the Supreme Court has eloquently explained: "The dignity of the United States Government will not permit the conviction of any person on tainted testimony." *Mesarosh*, 352 U.S. at 9.  Bailynson's perjured testimony is tainted.  Agresti was convicted based on the tainted testimony.  Our country's dignity cannot permit such a conviction.  Agresti has established that he deserves a new trial.

### a.  *Evidence of Bailynson's Perjury Is More Than Merely Impeaching or Cumulative*

Since the first and second elements sufficient for a grant of a new trial are not contested, the Court begins with the third element, which requires Agresti to show the new evidence is not merely impeaching or cumulative.  The Court begins with the simpler conclusion that Bailynson's perjured testimony was not cumulative.  Because no one else testified about the cash payments, Bailynson's testimony cannot be said to accumulate with any other witness's testimony.  *See also Valdes*, 2010 WL 11629648, at *9 (finding newly discovered evidence of perjury was not cumulative where the jury "received absolutely no evidence concerning the destruction of records and [the witnesses'] lies about it").

The question of whether the evidence is merely impeaching is more complicated because a "sworn statement that contradicts earlier testimony serves to impeach the witness's credibility and does not warrant a new trial if '[n]othing in the record suggests that this statement would probably produce an acquittal.'"  *Id.* (quoting *United States v. Diaz*, 190 F.3d 1247, 1255 (11th Cir. 1999)).  The District Court in *Valdes* explained this quirk in the test: "the wording of the test itself suggests that new evidence which is 'merely . . . impeaching' is never sufficient to warrant a new trial.  This raises a question: Is evidence of perjury ever more than 'merely impeaching?'" *Id.*  Relying on the Eleventh Circuit in *Diaz*, the District Court concluded that: "*Diaz* suggests that evidence of perjury functions merely to impeach *unless* it would probably lead to a different result

in a new trial." *Id.* Following this logic to its end, the *Valdes* court concluded: "[I]n cases where there is new evidence of perjured testimony, the third element of the test is satisfied if the fifth element is satisfied" because "evidence of perjured testimony by a key witness is more than mere impeachment evidence, and it 'taints' a conviction." *Id.* at 10.

Perjury, of course, does taint a conviction. Indeed, perjury taints the entire proceeding and corrupts the truth-seeking function of trial because it is a fundamental violation of our system of justice. The Government attempts to characterize Bailynson's perjury as impeachment—and nothing more—because he "was effectively cross-examined about his credibility throughout the first trial." [ECF No. 626] at 19 n.10, 25. By this argument, Bailynson's credibility was already evaluated by the jury because he described himself on the stand as a "very good" liar and defense counsel had a chance to ask about it. The Government thus implies that because perjury is just a *version* of lying and Bailynson was already asked about how much he lies, evidence of his perjury is simply impeachment material. *See id.* (maintaining, without mention of *pre*-trial evidence of perjury, that "[w]hile the exposure of his post-trial text messages would certainly provide more fodder for cross-examination, they would in the end be additional evidence to show Bailynson was a liar.").

But it is one thing to call someone a liar and quite another to *know* someone is a liar. As *Valdes* explains:

> New evidence of perjury performs two different functions. First, it shows a witness is a liar. When used this way, new evidence that a witness is a perjurer is for the purposes of impeachment. Second, evidence of perjury indicates there is new substantive evidence that may be presented at a new trial—specifically, the true version about what it was the witness had originally lied.

*Id.* at *11. And despite the Government's assertions, evidence of Bailynson's perjury is not just one more piece of evidence to show he is a liar. Defense counsel calling Bailynson a liar, or even Bailynson calling himself a liar, is simply not the same thing as the extensive evidence of perjury

by Bailynson in this case.   Bailynson's perjury here does not serve the first function of impeachment—it serves the second function and indicates there is a true version of events obscured by Bailynson's perjury.

Moreover, this second function of perjury mars a trial in a more pervasive manner than impeaching evidence.   Both parties rely on *Valdes* for support because, in that case, there was perjury and the motion for new trial was granted in part—giving each party a hook for its position in this case.   *Id.* at *12 (granting motion for new trial as to kickback counts only).   But the situation in *Valdes* differs in an important way.   *Valdes* involved perjury about the existence of a logbook, that while material and not cumulative or merely impeaching, did not form the entire basis of the Government's case.   *Id.*   Conversely, here, the Government's theory of the case relied, in significant part, on Bailynson's perjured cash payments narrative.   *See, e.g.*, [ECF No. 375] at 28 (arguing during opening that Agresti "demanded more and more in terms of salary along the way until he was making $18,000 a month as a medical director fee for GDSL just to order drug testing"); [ECF No. 407] at 36 (arguing during closing that Agresti "did it all . . . so he could make an easy $18,000 a month as the medical director").   Accordingly, given that the Government relied on the perjured testimony as a central component of its case, the perjury constitutes more than mere impeachment because a new trial would probably produce a different result.

### b.  The Evidence of Bailynson's Perjury Is Material

Bailynson's perjury was material.   Beyond the Government's own concession that there was no chance of conviction without his testimony, Bailynson testified as to an essential element of the alleged fraud: Agresti's intent.   No other evidence of Agresti's intent was presented at trial, and the story of the cash payments created a link between the circumstantial evidence regarding Agresti's awareness of the testing protocol at the sober living home and a clear action to participate

in the fraudulent conspiracy.  Bailynson's testimony provided a critical link where no other evidence existed to indicate what Agresti thought, knew, or intended.

Because there is sparse caselaw concerning the materiality of evidence on a motion for new trial, the Court draws instruction from a parallel materiality inquiry.  Under *Brady v. Maryland*, "the State violates a defendant's right to due process if it withholds evidence that is favorable to the defense and material to the defendant's guilt or punishment."  *Smith v. Cain*, 565 U.S. 73, 76 (2012) (citing 373 U.S. 83, 87 (1963)).  In the *Brady* context, evidence is material when a different outcome is reasonably probable, which means "only that the likelihood of a different result is great enough to 'undermine[ ] confidence in the outcome of the trial.'"  *Id.* at 75–76 (quoting *Kyles v. Whitley*, 514 U.S. 419, 434 (1995)) (alteration in original); *see also Kotteakos v. United States*, 328 U.S. 750, 764 (1946) ("The crucial thing is the impact of the thing done wrong on the minds of other men, not on one's own, in the total setting.").  In *Smith*, the alleged *Brady* violation concerned undisclosed statements by the only eyewitness linking the Defendant to the crime that directly contradicted his testimony.  *Smith*, 565 U.S. at 74–75.  And the Court was left "to speculate about which of [the eyewitness's] contradictory declarations the jury would have believed."  *Id.* at 76.

Though the *Brady* context is notably different, this framework provides a workable parallel for extrapolating materiality in the context of a motion for new trial.  Here, as in *Smith*, "the State's argument offers a reason that the jury *could* have disbelieved [the eyewitness's] undisclosed statements, but gives us no confidence that it *would* have done so."  *Id.*; *see also Kotteakos*, 328 U.S. at 764 (explaining the question is "what effect the error had or reasonably may be taken to have had upon the jury's decision").  Thus, in the context of an alleged *Brady* violation, the Supreme Court has explained an eyewitness statement is material when it was "the *only* evidence linking [the Defendant] to the crime."  *Smith*, 565 U.S. at 76.

Here, Bailynson was the only witness to provide direct evidence in the form of testimony addressing Agresti's intent and active participation in the conspiracy to commit healthcare fraud. His perjury thus undermines confidence in the trial because the Court is left to speculate about which of Bailynson's lies—if revealed—the jury would believe.   Accordingly, Bailynson's testimony is material.

### c.   A New Trial Would Probably Produce a Different Outcome

Given the crucial role Bailynson's testimony played during Agresti's trial, a new trial would probably produce a different outcome.  As the Government said when extolling the virtues of Bailynson's cooperation as his sentencing: "Without him, there would not have been a conviction, I don't think.  I suppose the expert was—but really, without Mr. Bailynson, there was *no chance of a conviction*."  [ECF No. 521] at 6–7 (emphasis added).  In the face of this direct and unequivocal statement by the Government, its argument that expert witness testimony would have sufficed to convict Agresti is unavailing.

The Government relies heavily on the impact of Dr. Jarvis's testimony as sufficient support for Agresti's conviction.  But, as an initial matter, the Court notes that subsequent Supreme Court precedent has placed such reliance in a precarious position.  In *Smith v. Arizona*, which came out three days before the parties submitted their evidentiary summations, the Supreme Court addressed the Confrontation Clause implications of an expert witness testifying about conclusions drawn by another expert who was not present.  602 U.S. 779 (2024).  Specifically, the Court explained that:

> A State may not introduce the testimonial out-of-court statements of a forensic analyst at trial, unless she is unavailable and the defendant has had a prior chance to cross-examine her.  Neither may the State introduce those statements through a surrogate analyst who did not participate in their creation.  And nothing changes if the surrogate— as in this case—presents the out-of-court statements as the basis for his expert opinion.  Those statements, as we have explained, come into evidence for their truth—because only if true can they provide a reason to credit the substitute expert.  So a defendant has the right to cross-examine the person who made them.

*Id.* at 802–03 (internal citations omitted). Given that portions of Dr. Jarvis's testimony relied on conclusions of another doctor, any future testimony, at the very least, would need to take a very different form to avoid a Confrontation Clause concern. *See, e.g.*, [ECF No. 383] at 8 ("Q. Okay. And did Dr. Clark write a report in this case? A. She did write a report in this case, and that was part of what the Government asked me to review, and I did. And I went through the files. I looked through the evidence. And I would say that 99 percent, I would be right on board with what Dr. Clark put in her report.").

The Government relies on Dr. Jarvis's testimony to establish that there was too much urinalysis testing; that such testing could not have been medically necessary unless reviewed by a physician; and that Agresti's stated purpose of deterrence only makes sense if cheaper tests were used. These conclusions, as well as Dr. Jarvis's belief that there was no "medical rationale for those tests" and that "there's some other reason, perhaps financial gain, . . . for doing it," are arguably the only evidence presented that could imply Agresti violated a standard of care (though there was no such standard at the time). [ECF No. 384] at 58. Thus, the Government's certainty that "[b]ased on Dr. Jarvis'[s] testimony alone . . . the Defendant could have been convicted" is dubious. [ECF No. 626] at 11.

As to the larger question, Agresti has sufficiently established that the newly discovered evidence of Bailynson's perjury would probably produce a different outcome. A detailed review of the Government's remaining evidence shows that no one knew anything about what Agresti thought or knew. Both parties agreed that the only issue at trial was Agresti's intent. Yet some of the witnesses the Government relies on now in opposition to a new trial never spoke to Agresti, making it quite troublesome to believe they might have known anything about his mental state or intent. Most importantly, Bailynson played a fundamental role in the trial. His testimony alone

occupied over a third of the trial given that it spanned over four of the eleven days and his perjury was the foundation of the Government's theory of the case.

Indeed, Bailynson's presence cast a pall over the proceedings.  And Agresti quite credibly argues that he would not have testified if he had not felt the need to rebut Bailynson's story of the cash payments.  Because the trial became Bailynson's word against Agresti's, and no other living person could corroborate the story, Agresti's testimony was his only chance to rebut Bailynson's tale.  The Government attempts to argue that the testimony of the IRS agent contradicted Agresti's version of events, thus forcing him to testify.  But the impact of a federal agent relaying a conversation with slight contradictions from years prior is very different than the impact of an alleged co-conspirator weaving a tale of mysterious cash payments revealing a mastermind.  It is not at all obvious that Agresti would have submitted himself to cross-examination because of the IRS agent alone.

Because the Government's theory of the case relied, in pertinent part, on Bailynson's lies, Agresti is able to point to a long list of other evidence potentially infected by his perjury—and explain how a jury might see things differently without Bailynson's influence.  As one legal scholar has noted: "Errors can contribute to verdicts by changing the shape of other pieces of evidence or the mind of one juror."  Lisa Kern Griffin, *Criminal Adjudication, Error Correction, and Hindsight Blind Spots*, 73 *Wash. & Lee L. Rev.* 165, 207 (2016).  Agresti credibly contends that many moments in the trial could change shape, including: the fact that Agresti made no factual misstatements about patient conditions or patient treatment in any letter to insurance companies; the fact that the issue of medical necessity was handled differently by certain insurance companies as to how much testing was warranted to prevent addiction relapse; the possibility that Bailynson's description of the GDSL employee's competence in reviewing laboratory testing results might have been crafted just to prejudice Agresti; the fact that the function of reviewing the urinalysis

tests was geared toward maintaining residential qualification, not some other ongoing treatment by the doctor (and that Agresti's explanation of this fact to insurance companies caused some to stop paying); that medical necessity is not defined by "what is cost-effective," as the Government argued in closing, [ECF No. 407] at 132; and that the step-down protocol authored by Agresti might well have been authentic (contrary to what Bailynson claimed). [ECF No. 627] at 18–20.

Moreover, binding precedent arguably leaves to the jury the question of how much a trial will change shape when new evidence of perjury is discovered. As the Eleventh Circuit has explained: "[O]nly a jury could determine what it would have done with a different body of evidence and . . . since the jury could no longer act in the case[,] a new trial [is] required." *United States v. Brunoehler*, 714 F.2d 99, 101 (11th Cir. 1983) (per curiam) (citing *Mesarosh*, 352 U.S. at 12). To reach this conclusion, the Eleventh Circuit relied on the "*Mesarosh* requirement that the issue of the truthfulness of the witness be presented fully to the jury," to distinguish between situations in which the jury knew about a witness's untruthfulness during trial and those where the Government did not discover evidence of perjury or untruthfulness until after trial. 714 F.2d at 101 (internal citations omitted). *Brunoehler* thus instructs that the issue of truthfulness of a witness in cases where there is evidence of perjury—not merely untruthfulness that may have already been impeached—must be presented to the jury. *Id.* at 102. Here, the issue of Bailynson's perjury is clearly one for a jury, and a new trial is therefore warranted.

The Eleventh Circuit's analysis in *United States v. Espinosa-Hernandez* provides a further useful comparison. 918 F.2d 911 (11th Cir. 1990) (per curiam). In *Espinosa-Hernandez*, the Eleventh Circuit analyzed a district court's denial of a motion for discovery into alleged misconduct by the Customs Service agent in charge of the investigation that led to conviction, and the subsequent denial of a motion for new trial. *Id.* at 912. In the course of reversing the district court as to both motions and remanding for discovery and an evidentiary hearing, the *Espinosa-*

*Hernandez* court explained that if discovery showed that a key witness committed perjury in a similar proceeding, then "the discovered evidence would be beyond that of mere impeachment and a new trial would be necessary to 'remove the taint' from Espinosa's conviction." *Id.* at 914 (citing *Brunoehler*, 714 F.2d at 101).

On this point, Agresti specifies pieces of testimony that jurors could have seen differently had Bailynson's perjury been revealed or purged from the trial.  Notably, one witness, Sangillo, testified that Bailynson effectively "kept the GDSL staff away from Dr. Agresti" so that they were not "able to reach out to [the] physician," [ECF No. 379] at 830, and that "Dr. Agresti told Maxine Breglia he was not comfortable with the frequency with which Ken Bailynson was testing," *id.* at 832.  This is the same witness that said she resigned because of ethical concerns after meeting with Bailynson, and who also testified that she had seen Agresti only once and had not spoken to him. [ECF No. 379] at 178–79.  Agresti also points to the testimony and impeachment of Calame Ortiz as evidence that a jury might see things differently if it knew about Bailynson's perjury.  While Calame Ortiz testified that she had not received any money from Bailynson, a law enforcement officer testified that Calame Ortiz had previously explained that she would stand on a street corner to recruit prospective addicts and that Bailynson would pay her $300-500 per "referral."  [ECF No. 403] at 36–38.  Without Bailynson's perjured story about Agresti's cash payments, the jury might have viewed inconsistencies in Calame Ortiz's testimony or Sangillo's explanations of how Bailynson segregated staff from Agresti differently—instead of perceiving such testimony as corroboration of Agresti's criminal intent.

## **CONCLUSION**

In sum, Bailynson, "by his testimony, has poisoned the water in this reservoir, and the reservoir cannot be cleansed without first draining it of all impurity." *Mesarosh*, 352 U.S. at 14. Accordingly, a new trial is warranted—one untainted by Bailynson's perjury.  For the foregoing

reasons, it is hereby **ORDERED AND ADJUDGED** that Defendant's Motion for New Trial, [ECF No. 585], is **GRANTED**.

      **DONE AND ORDERED** in Miami, Florida this 30th day of January, 2025.

**RODOLFO A. RUIZ II**
**UNITED STATES DISTRICT JUDGE**